AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| 950 S. Cimarron Way, Apartment G202, Aurora, Colorado, 80012-4914, more fully described in Attachment A, attached hereto | ) Case No. 20-sw-01523-NYW |
| | ) |
| | ) |
| | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

located in the _____State and_____ District of _____Colorado_____, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1343, 1344, 1028, 1956, and 1957 | Wire Fraud, Bank Fraud, and Money Laundering |

The application is based on these facts:

☒ Continued on the attached affidavit, which is incorporated by reference.
☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/Lynelle C. Torikai*
_____
*Applicant's signature*

Lynelle C. Torikai, Special Agent, FBI
_____
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: **22 Dec 2020**
_____

_____
*Judge's signature*

Nina Y. Wang
United States Magistrate Judge
_____
*Printed name and title*

City and state: _____Denver, Colorado_____

## ATTACHMENT A

## DESCRIPTION OF LOCATION TO BE SEARCHED

The Subject Premises is located at 950 S. Cimarron Way, Apartment G202, Aurora, Colorado, 80012-4914.  The Subject Premises is more particularly identified as an apartment located on the second floor of the Retreat at City Center apartment complex.  Unit G202 is located on the east side of the parking structure near the pedestrian bridge connecting the sixth floor of the parking structure to the residential building.  Apartment G202 is the first door on the right as one crosses the pedestrian bridge from the parking structure.  The door is brown in color and a brown colored rectangle with "G202" in white is affixed to the wall to the left of the door above a metal clip.



Front door of Subject Premises:

 

# ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED

Agents and investigative officers are authorized to search for and seize the following items, located at the Subject Premises, that constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of violations of Title 18, United States Code, Sections 1343 (Wire Fraud), 1344 (Bank Fraud), 1028 (Fraud and Related Activity in Connection with Identification Documents), and 1956 and 1957 (Money Laundering) (hereinafter "Subject Offense(s)") occurring between the dates February 5, 2020 to present, including the following:

1. Records pertaining to the Subject Offenses, including:
   a. Records, documents, programs, applications or materials relating to identification documents, including foreign passports;
   b. Records and items that show dominion and control of the property searched, to include utility bills, telephone bills, correspondence, rental agreements, cancelled mail, and other identification documents;
   c. Records, documents, programs, applications or materials relating to safety deposit boxes, Commercial Mail Receiving Agencies, or receiving mail at another address;
   d. Records, documents, programs, applications or materials relating to photos of Olayinka Famofo-Idowu, Olanike Alo, Brian Henry Chaffin, Isreal [sic] Pena, Irving Nelson Stein, Gregory Allen Clatterbuck, Henry Stanford Jayson, and other aliases associated with IDOWU and/or images of IDOWU;
   e. Financial documents, records, applications, or materials relating to Olayinka Famofo-Idowu, Olanike Alo, Brian Henry Chaffin, Isreal [sic] Pena, Irving Nelson Stein, Gregory Allen Clatterbuck, Henry Stanford Jayson, and other aliases associated with IDOWU and/or images of IDOWU;
   f. Records and information that tend to establish ownership or use of digital devices and ownership or use of any Internet service accounts accessed to commit the Subject Offenses, to include credit card bills, telephone bills, correspondence and other identification documents.
   g. Cash, currency, jewelry, financial instruments, and/or records relating to the laundering, secreting, and/or distribution of monies related to the proceeds the Subject Offenses.

2. Computers, which include all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, any physical object upon which computer data can be recorded, including desktop and laptop computers, computer hardware, computer software, volatile data, cellular telephones, tablets, server computers, gaming devices, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media, as well as, computer related documentation, computer passwords and data security devices, digital communications devices, cameras, videotapes, video recording devices, video recording players, and video display monitors, digital input and output devices such as keyboards, mouse(s), scanners, printers, monitors, electronic media and network equipment, modems, routers, connection and power cords, and external or connected devices used for

accessing computer storage media that was used to commit or facilitate commissions of the Subject Offense(s) (collectively hereinafter, "COMPUTER").

3. For any COMPUTER or storage medium whose seizure is otherwise authorized by this warrant, and any COMPUTER or storage medium that contains or in which is stored records or information that is otherwise called for by the warrant:

   a. evidence of who used, owned, or controlled the COMPUTER at the time the items described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, user profiles, e-mail, e-mail contacts, "chat" or instant messaging logs, photographs, and correspondence;

   b. evidence indicating how and when the COMPUTER was accessed or used to determine the chronological context of COMPUTER access, use, and events relating to the Subject Offense(s) and to the computer user;

   c. evidence indicating the computer user's state of mind as it relates to the Subject Offense(s);

   d. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

   e. evidence of the times the COMPUTER was used;

   f. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

   g. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

   h. records of or information about Internet Protocol addresses used by the COMPUTER;

   i. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

   j. contextual information necessary to understand the evidence described in this attachment;

   k. information about usernames or any online accounts or email addresses associated with Olayinka Famofo-Idowu or aliases utilized by Idowu;

   l. volatile data necessary to preserve evidence prior to powering-off and unplugging a running computer;

m.  Information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to the Subject Offense(s), as described in item #1 of this Attachment;

n.  items otherwise described above in paragraphs of this Attachment B.

Executing law enforcement personnel are authorized to depress the fingerprints and/or thumbprints of Olayinka Famofo-Idowu onto the Touch ID or fingerprint sensor of any Apple iPhone, iPad, or other Apple brand device, or other device that has a fingerprint sensor, in order to gain access to the contents of any such device. Law enforcement personnel may also hold the device(s) found at the Subject Premises in front of the face of Olayinka Famofo-Idowu to activate the facial recognition feature; and/or hold the device(s) found at the Subject Premises in front of the face of Olayinka Famofo-Idowu to activate the iris recognition feature, for the purpose of unlocking the device(s) in order to search the contents as authorized by this warrant.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

<u>DEFINITIONS:</u>

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Lynelle C. Torikai, a Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn, depose and state that the following is true to the best of my information, knowledge and belief.

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the FBI and have been since September 1997. I am currently assigned to the Los Angeles Division, Orange County Resident Agency and specifically to the Violent Crime Major Offenders squad (OCRA1). My duties and responsibilities include the investigation of organized crime groups in violation of various Title 18 statutes, including money laundering in violation of Title 18 U.S.C. §§ 1956 and 1957, the sexual exploitation of children on the Internet, violent crimes, and various fraud schemes. During the course of my career with the FBI, I have participated in investigations involving complex financial fraud schemes and money laundering offenses.

2.      My law enforcement experience includes, but is not limited to, conducting surveillance; interviewing subjects, targets, and witnesses; writing affidavits for and executing search warrants; issuing administrative subpoenas; analyzing phone records; and analyzing data derived from the use of pen registers, trap and trace devices, and Title III (wiretap) investigations. Through training and experience, I am familiar with the methods and means used by organized crime groups to commit various fraud schemes and launder their criminal proceeds. I am also familiar with how those individuals and organizations hide the often-substantial profits generated from their criminal enterprise activities. I have conducted investigations regarding various bank fraud schemes committed by mail and wire, as well as the related money laundering statutes involving the proceeds of specified unlawful activities and conspiracies associated with criminal enterprises, in violation of Title 18, United States Code, Sections 1343 (Wire Fraud), 1344 (Bank Fraud), 1028 (Fraud and Related Activity in Connection with Identification Documents), and 1956 and 1957 (Money Laundering).

3.      This affidavit is submitted in support of an application for a search warrant for the residence located at 950 S. Cimarron Way, Apartment G202, Aurora, Colorado, 80012, which is further described in Attachment A (hereinafter "Subject Premises"), and the computer(s) located therein, there being probable cause to believe that located in the place described in Attachment A are items described in Attachment B, being evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1343 (Wire Fraud), 1344 (Bank Fraud), 1028 (Fraud and Related Activity in Connection with Identification Documents), and 1956 and 1957 (Money Laundering) (the "Subject Offenses").  Attachments A and B are incorporated herein by reference.

4.      Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.   I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of the Subject Offenses are presently located at the Subject Premises.

5.      The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

## TECHNICAL TERMS

6.      Based on my training and experience, I use the following technical terms to convey the following meanings:

7.      IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address may look like a series of four numbers, each in the range 1-255, separated by periods (e.g., 121.56.97.178).   Internet Protocol version 6 (IPv6) is the most recent version of the Internet Protocol (IP).  IPv6 addresses are represented as eight groups, separated by colons, of four hexadecimal digits.  The full representation may be shortened; for example 2001:0db8:0000:0000:0000:8a2e:0370:7334 becomes 2001:db8::8a2e:370:7334.   Every computer attached to the Internet must be assigned an

IP address so that the Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static — that is, long-term — IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

8. Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMSs, and other magnetic or optical media.

9. In this affidavit, the terms "computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and are intended to include types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, any physical object upon which computer data can be recorded, including desktop and laptop computers, computer hardware, computer software, volatile data, cellular telephones, tablets, server computers, gaming devices, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media, as well as, computer related documentation, computer passwords and data security devices, digital communications devices, cameras, videotapes, video recording devices, video recording players, and video display monitors, digital input and output devices such as keyboards, mouse(s), scanners, printers, monitors, electronic media and network equipment, modems, routers, connection and power cords, and external or connected devices used for accessing computer storage media that were used to commit or facilitate commissions of the Subject Offenses (collectively hereinafter, "computers").

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

10. As described above and in Attachment B, I submit that if computers are found at the Subject Premises, there is probable cause to search and seize those items for the reasons stated below. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might

take a form that becomes meaningful only upon forensic analysis. They may be seized and searched on-scene, and/or searched off-scene in a controlled environment.

11.     For example, based on my knowledge, training, and experience, I know that a powered-on computer maintains volatile data. Volatile data can be defined as active information temporarily reflecting a computer's current state including registers, caches, physical and virtual memory, network connections, network shares, running processes, disks (floppy, tape and/or CD-ROM), and printing activity. Collected volatile data may contain such information as opened files, connections to other computers, passwords used for encryption, the presence of anti-forensic tools, or the presence of programs loaded in memory that would otherwise go unnoticed. Volatile data and its corresponding evidentiary value is lost when a computer is powered-off and unplugged.

12.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, delete, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or even years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space-that is, in space on the storage medium that is not currently being used by an active file-for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

13.     Also, again based on my training and experience, wholly apart from user-generated files, computer storage media contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, virtual memory "swap" or paging files, and shadow copies of previous

versions or systems or files, or paging files. Computer users typically do not erase or delete this evidence because special software is typically required for that task. However, it is technically possible to delete this information. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted, edited, moved, or show a deleted portion of a file (such as a paragraph that has been deleted form a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices of other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

14.     As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, why they were used, the purpose of their use, and the purposes to which they were put, who used the, the state of mind of the user(s), and when they were used.

15.     The monitor and printer show the nature and quality of the images of files that the system can produce. In addition, the analysts needs all assisting software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other documentation and security devices. Moreover, searching computerized information for evidence or instrumentalities of crime commonly requires the seizure of the entire computer's input/output periphery devices (including related documentation, passwords, and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment.

16.     The computer and its storage devices, the mouse, the monitor, keyboard, printer, modem, and other system components are also used as instrumentalities of the crime to operate

the computer to commit the offenses discussed in this affidavit. Devices such as modems and routers can contain information about dates, IP addresses, MAC addresses, frequency, and computers(s) used to access the Internet or to otherwise commit the crimes described herein. The computer equipment may also have fingerprints on them indicating the user of the computer and its components.

17. Similarly, information or files related to the crimes described herein are often obtained from the Internet or the cellular data networks using application software which often leaves files, logs, or file remnants which would tend to show the identity of the person engaging in the conduct as well as the method of location or creation of the images, search terms used, exchange, transfer, distribution, possession or origin of the files. Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

18. "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat", instant messaging logs, photographs, videos, and correspondence (and data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

19.     Your affiant knows from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address. Examination of these items can reveal information about the authorized or unauthorized user of Internet connection at the residence.

20.     Searching computer(s) for the evidence described in the attachment may require a range of data analysis techniques. For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed. Or, a person engaged in criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names. As explained above, because the warrant calls for records of how a computer has been used, what is has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects required searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use a multitude of techniques, both on and off-scene, including more thorough techniques.

21.     Based upon my knowledge, training, and experience, I know that a thorough search for information stored in digital storage media requires a variety of techniques that often includes both on-site seizure and search as well as a more thorough off-site review in a controlled environment. This variety of techniques is required, and often agents must seize most or all storage media to be searched on-scene and/or later in a controlled environment. These techniques are often necessary to ensure the accuracy and completeness of data recorded on the

storage media, and to prevent the loss of the data either from accidental or intentional destruction.

22.     For example, the search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following on-site techniques (the following is a non-exclusive list, as other on-site search procedures may be used):

A.   On-site triage of computer systems to determine what, if any, peripheral devices or digital storage units have been connected to such computer systems, a preliminary scan of image files contained on such systems and digital storage devices to help identify any other relevant evidence or potential victims, and a scan for encryption software;

B.   On-site copying and analysis of volatile memory, which is usually lost if a computer is powered down, and may contain information about how the computer is being used, by whom, when, and may contain information about encryption, virtual machine software (virtual operating systems that are lost if the computer is powered down or encrypted);

C.   On-site forensic imaging of any computers may be necessary for computers or devices that may be partially or fully encrypted, in order to preserve unencrypted electronic data that may, if not immediately imaged on-scene, become encrypted and accordingly unavailable for any examination.

23.     The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage may include off-site techniques since it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined off-site and in a controlled environment. This is true because of the following:

A.   The nature of the evidence. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how, when and why a computer has been used, by whom, what it has been used for, requires considerable time, and taking that much time on premises could be unreasonable. Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory may be essential to its complete and accurate analysis. Searching for and attempting to recover any deleted, hidden, or encrypted data may be required to determine whether data falls within the list of items to be seized as set forth herein (for example, data that is encrypted and unreadable may not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal

activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of child exploitation offenses).

B. <u>The volume of evidence and time required for an examination</u>. Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Reviewing information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

C. <u>Technical requirements</u>. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

D. <u>Variety of forms of electronic media</u>. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

E. <u>Need to review evidence over time and to maintain entirety of evidence</u>. Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis. Your Affiant has learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops. In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review, and incorporation of evidence into a consolidated whole. Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. In the past, your Affiant has reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations. Your affiant has learned from that experience, as well as other

investigative efforts, that multiple reviews of the data at different times are necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B. In order to obtain the full picture and meaning of the data from the information sought in Attachment B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential for probative value of the data must be assessed within the full scope of the investigation. As such, your Affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation. As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

24.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for permits both on-site seizing, imaging and searching, and off-site imaging and searching of storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later and perhaps repeated examination consistent with the warrant. The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

25.     Your affiant knows from training and experience that digital storage devices can be very large in capacity, yet very small in physical size. Additionally, your Affiant knows from training and experience that those who are in possession of such devices also tend to keep them on their persons, especially when they may contain contraband or other evidence of a crime. The storage capacity of such devices can be as large as tens of gigabytes in size as further described below, which allows for the storage of thousands of images and videos as well as other digital information such as calendars, contact lists, programs, and text documents. Such storage devices can be smaller than a postage stamp in size, which allows them to be easily hidden in a person's pocket.

26.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices,

particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

27.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprints authorized to access the particular device are a part of the security settings of the device and will allow access to the device in lieu of entering a numerical passcode or longer alpha-numerical password, whichever the device is configured by the user to require.

28.     The Touch ID feature only permits up to five attempts with a fingerprint before the device will require the user to enter a passcode. Furthermore, if the device is equipped with an operating system that is earlier than version 9.3, the Touch ID feature will not substitute for the use of a passcode or password if more than 48 hours have passed since the device has been unlocked; in other words, if more than 48 hours have passed since the device was accessed, the device will require the passcode or password programmed by the user and will not allow access to the device based on a fingerprint alone. If the operating system is version 9.3 or later, that time frame shrinks to 8 hours.

29.     Similarly, Touch ID will not allow access if the device has been turned on or restarted, if the device has received a remote lock command, or if five attempts to match a fingerprint have been unsuccessful. For these reasons, it is necessary to use the fingerprints and thumbprints of any device's users to attempt to gain access to any Apple devices found at the Subject Premises while executing the search warrant. The government may not be able to obtain

the contents of the Apple devices if those fingerprints are not used to access the Apple devices by depressing them against the Touch ID button. Although I do not know which of the ten finger or fingers are authorized to access on any given Apple device and only five attempts are permitted, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for Touch ID, and in any event, all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

30.     In addition, I know from my training and experience that many other mobile device manufactures have their own version of Touch ID—that is, a fingerprint recognition feature that the device's user can program and use to unlock the device. For instance, I know that Google Pixel phones and Google Pixel XL phones have a fingerprint sensor that can be used to unlock the device. Similarly, Samsung, LG, HTC, and other manufacturers also have devices with fingerprint sensors.

31.     Similarly, in my training and experience I know that some applications loaded onto mobile devices or other electronic devices may be secured by the user with a thumbprint or fingerprint. Common among these types of applications are applications such as mobile banking apps or other financial applications, password storage applications, and secure communications apps, among others.

32.     Further, if a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers (such as Apple's "Face ID") have different names but operate similarly to Trusted Face.

33.     Similarly, if a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

34.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

35.     As discussed in this Affidavit, your Affiant has reason to believe that one or more digital devices ("the Device(s)") will be found during the search. The passcode or password that would unlock the Device(s) subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the Device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

36.     Due to the foregoing, I am informing the Court that if law enforcement personnel encounter any Device(s) that are subject to seizure pursuant to the requested warrants and may be unlocked using one of the aforementioned biometric features, law enforcement personnel intends to obtain from OLAINKA FAMOFO-IDOWU ("IDOWU") the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any Device(s), including to (1) press or swipe the fingers (including thumbs) of IDOWU to the fingerprint scanner of the Device(s) found at the Subject Premises; (2) hold the Device(s)

found at the Subject Premises in front of the face of IDOWU to activate the facial recognition feature; and/or (3) hold the Device(s) found at the Subject Premises in front of the face of IDOWU to activate the iris recognition feature, for the purpose of unlocking the Device(s) in order to search the contents as authorized by this warrant.

37.     Your Affiant knows from training and experience that search warrants of residences involved in computer or digitally related criminal activity usually produce items that tend to establish ownership or use of digital devices and ownership or use of any Internet service accounts accessed to commit the crimes described in this affidavit, to include credit card bills, telephone bills, correspondence and other identification documents.

38.     Your Affiant knows from training and experience that search warrants of residences usually reveal items that tend to show dominion and control of the property searched, to include utility bills, telephone bills, correspondence, rental agreements and other identification documents.

39.     Your Affiant knows from training and experience that seized computers may contain communications to/from an attorney. If the government identifies seized communications to/from an attorney, the investigative team will discontinue review until a filter team of one or more government attorneys and other government personnel, as needed, is established. The filter team will have no previous or future involvement in the investigation of this matter. The filter team will identify and segregate communications to/from attorneys, which may or may not be subject to attorney-client privilege. At no time will the filter team advise the investigative team of the substance of any of the communications to/from attorneys. The filter team then will provide all communications that do not involve an attorney to the investigative team, and the investigative team may resume its review. If the filter team believes that any of the communications to/from attorneys are not actually privileged (e.g., the communication includes a third party), and if the investigation is not covert, the filter team will first seek to obtain agreement from the appropriate defense counsel before providing these attorney communications to the investigative team. If consulting with defense counsel is not possible or does not produce

an agreement, the filter team will obtain a court order before providing these attorney communications to the investigative team.

## **PROBABLE CAUSE**

40.      OLAYINKA FAMOFO-IDOWU ("IDOWU") is one of several targets of an on-going criminal investigation in Orange County, California in the Central District of California, that is being investigated by the Department of Homeland Security (DHS), Homeland Security Investigation (HSI), the United States Postal Inspection Service (USPIS), and the Federal Bureau of Investigation (FBI) for violations of federal statutes, including the Subject Offenses.



**Olayinka Famofo-Idowu**

41.      IDOWU, along with other Nigerian national co-conspirators in the United States (U.S.), has received fraudulent passports and other identification documents at various Commercial Mail Receiving Agencies (CMRAs) since at least October 2016 and has utilized those documents to open numerous bank accounts in Southern California. The fraudulently opened bank accounts received hundreds of thousands of dollars from fraud victims around the U.S. IDOWU and his co-conspirators then sent the fraudulently received funds to foreign bank accounts or other bank accounts in the U.S. via cashier's checks or wire transfers.

42.     IDOWU relocated to Aurora, Colorado in February or March 2020, where he has presented two fraudulent Nigerian passports in two different names bearing the same photograph of himself at CMRAs in Denver and Aurora to receive mail. IDOWU has utilized both the fraudulent Nigerian passports to open and access bank accounts in Aurora, Colorado. One of the fraudulent identities IDOWU used was Brian Chaffin.



43.     On March 27, 2020, Olanike ALO, IDOWU's true Nigerian wife,[1] updated her address with U.S. Citizenship and Immigration Services (USCIS) as 950 S. Cimarron Way, Apartment G202, Aurora, Colorado, 80012. Physical surveillance and subsequent investigation conducted by United States Postal Inspection Services and the FBI determined IDOWU, ALO, and their two minor sons reside at the Subject Premises. IDOWU was observed at the Subject Premises as recently as December 20, 2020.

### Federal Investigation in the Central District of California

44.     IDOWU and several co-conspirators are currently being investigated by the Department of Homeland Security, Homeland Security Investigations (HSI), United States Postal

---

[1] On paper, IDOWU married Danalle Franklin, a United States citizen, in 2016, but agents believe that this marriage is a sham marriage and that both ALO and IDOWU staged sham marriages in order to gain status in the United States.

Inspection Services (USPIS), and the Federal Bureau of Investigation (FBI) for violating federal offenses, including the Subject Offenses.

45.     On May 21, 2018, The Eye & Ear Foundation of Pittsburgh ("EEFP"), located in Pittsburgh, Pennsylvania, fell victim to an on-line email fraud scheme which caused a wire transaction of $350,000.00 to be sent from their accounts maintained by Rockefeller Capital Management ("Rockefeller") to a Suntrust Bank account in Florida. The wire transaction was completed in the afternoon of May 21, 2018.

46.     After a second wire transaction of $480,000.00 was requested, Rockefeller realized the request was fraudulent. Rockefeller discovered the previous request to wire $350,000.00 was also fraudulent and the Pittsburgh Division of the FBI was contacted.

47.     Subsequent investigation by FBI SA Chase Stephens, Pittsburgh Division, revealed the Suntrust bank account was held by J.W., year of birth 1934, of Summerfield, Florida. J.W. was interviewed and identified as a victim of a romance fraud who was being directed to send and receive funds by an individual who she met on www.Match.com named Michael Warren. Warren informed J.W. she would be receiving a $350,000.00 wire into her account and instructed her to obtain two cashier's checks for $115,000.00 and $112,500.00 and send them to Isreal [sic] Lopez[2] in Orange, California. On May 22, 2018, J.W. sent the two cashier's checks via Federal Express.

48.     SA Stephens contacted Federal Express and inquired about the Federal Express envelope sent by J.W. Federal Express identified an envelope bearing tracking number 7810 8491 7716 addressed to Isreal [sic] Pena, 230 City Blvd. W. Apt. 201, Orange, CA 92868. Due to the fact the envelope contained evidence of a crime, Federal Express agreed to release the envelope to your Affiant. Your Affiant returned the envelope and its contents to SA Stephens in Pittsburgh.

---

[2] During the interview, J.W. could not recall Isreal's [sic] last name and believed it was Lopez. However, after obtaining the Federal Express information, the envelope was addressed to Isreal [sic] Pena.

49.     On July 2, 2018, Federal Express provided information which confirmed the sender to be J.W. and the recipient as Isreal [sic] Pena. Also provided were Federal Express Tracking Logs which included IP addresses utilized to track the location of the envelope as it was sent from J.W. in Florida to Pena in California. One IP address identified as accessing the tracking function was 23.241.239.47.

50.     On July 2, 2018, a query of www.centralops.net revealed Time Warner Cable Internet LLC/Charter Communications, Inc as the Internet Service Provider (ISP) in control of the IP address 23, 241, 239.47. On July 17, 2018, your Affiant requested information from Time Warner Cable Internet LLC/Charter Communications, Inc. which included subscriber information for the customer issued IP address 23.241.239.47 on May 24, 2018 at 2:26 p.m. Central Standard Time (CST), May 25, 2018 at 8:39 a.m. CST, May 26, 2018 at 11:57 a.m. CST, and May 29, 2018 at 11:46 a.m. CST. On July 17, 2018, Charter Communications, Inc. identified the subscriber of 23.241.239.47 on the respective dates and times to be Olayinka Famofo, 230 City Blvd. W., Apt 201, Orange CA 92868, phone number (714) 234-9819.

51.     Unbeknownst to the FBI, HSI was also investigating IDOWU for violations of the Subject Offenses. On March 29, 2019, a federal search warrant was executed at IDOWU's residence located at 230 City Boulevard W., Apt. 201, Orange, California, 92868. Two fraudulent Nigerian passports that bore IDOWU's photo issued under the names Irving Nelson Stein and Gregory Allen Clatterbuck were seized. Also seized were financial documents from Bank of America and JP Morgan Chase Bank in the same alias names.

52.     During the execution of the federal search warrant, numerous digital devices were seized. Review of the digital devices revealed banking information under numerous names, images of fraudulent passports, and text message communications regarding financial transactions.

53.     During the execution of the federal search warrant, IDOWU was interviewed by HSI Special Agents after being advised of his *Miranda* rights and admitted to the following:

a.    IDOWU received fraudulent passports bearing his photograph in various fictitious names from a co-conspirator in Nigeria;

b.    IDOWU opened numerous bank accounts utilizing the fraudulent passports to which funds were deposited from unknown sources;

c.    IDOWU kept 5% of all funds deposited as payment for his services;

d.    IDOWU transferred the remaining funds into other bank accounts or mailed bulk cash to co-conspirators.

54.    Pursuant to proffers on July 22, 2019 and August 9, 2019, IDOWU and his counsel met with the government during which IDOWU admitted to violating the Subject Offenses. IDOWU agreed to cooperate with the government. IDOWU provided historical information of his and other co-conspirators' involvement in the Subject Offenses and assisted the government by consensually monitoring calls with co-conspirators, introducing an undercover employee to a co-conspirator, and contacting a co-conspirator in Nigeria which led to a fraudulent passport being sent to IDOWU. IDOWU turned over the fraudulent Nigerian passport to the government. However, due to IDOWU's inability and/or unwillingness to provide additional information, IDOWU's cooperation was discontinued on or about January 13, 2020.

55.    Based on, among other things, the aforementioned information, the Honorable Karen L. Stevenson, United States Magistrate Judge for the Central District of California, issued a complaint charging IDOWU with Wire Fraud in violation of 18 U.S.C. § 1343 on December 20, 2020 (Docket No. 2:20-MJ-6176).

**IDOWU Utilizes Alias of Henry Stanford Jayson in Colorado**

56.    Following the termination of IDOWU's cooperation, his fraudulent activities appeared to resume upon his relocation to Colorado. On March 24, 2020, United States Postal Inspection Service (USPIS) Postal Inspector (PI) Sonia Hacker received a call about a Minnesota Craigslist scam victim, LM, who mailed Postal Money Orders totaling $1,500.00 via United States Express Mail to The UPS Store #2328 located at 303 South Broadway, Suite 200, Denver, Colorado, 80209. PI Hacker interviewed the manager of The UPS Store #2328 who recalled

seeing a black male using the name Henry Stanford Jayson come into The UPS Store #2328 immediately after the US Postal Service truck arrived with the day's delivery and requested to pick up his Express Mail. The customer's identification matched the name on the package.

57.     On March 25, 2020, PI Hacker spoke to victim LM telephonically who advised he fell victim to a scam after attempting to sell a sofa on Craigslist. LM spoke to the buyer who inquired if LM would accept a cashier's check as payment. LM received a cashier's check for an amount significantly greater than the price of the sofa. The cashier's check was for $1,900 and the buyer told LM $400 was for the cost of the sofa and $1,500.00 was to pay the movers to deliver the sofa to the buyer. The buyer requested LM mail two Postal Money Orders, serial numbers 26367122935 and 26367122946 for $1,000.00 and $500.00 respectively, to a Henry Stanford Jayson at 303 S. Broadway in Denver, Colorado. After LM mailed the Postal Money Orders, LM received a call from his bank and learned the cashier's check was counterfeit. PI Hacker requested copies of the Treasury Images of the Postal Money Orders.

58.     On March 26, 2020, PI Hacker was informed the Postal Money Orders had been cashed. PI Hacker obtained images of the cashed Postal Money Orders. Both Postal Money Orders were made payable to OLAYINKA FAMOFO-IDOWU with an address of 230 City Boulevard W., Orange, California, 92868 (the address where the federal search warrant was executed as detailed above in paragraph 51.) No payor name was indicated but an address of 303 S. Broadway, Suite 200, Denver, Colorado, 80209 was listed. Both Postal Money Orders were deposited on May 24, 2020 into a Comerica Bank California account ending in 4508 and held by IDOWU.

59.     On April 1, 2020, PI Hacker was informed a DHL package bearing tracking number 1820666886 had been delivered to The UPS Store #2328 for Henry Stanford Jayson. Upon picking up the DHL package, Jayson presented a Nigerian passport, number A04332091, in the name Henry Stanford Jayson and date of birth of June 19, 1984. The UPS Store #2328 personnel obtained a copy of the Nigerian passport, depicted below:



A query of the tracking number revealed the package originated in Lagos, Nigeria.

60.     On April 9, 2020, at approximately 11:07 a.m., The UPS Store #2328 advised PI Hacker that a USPS Express Mail envelope addressed to Jayson was received. The sender of the USPS Express Mail was Alex Garcia at 733 S. Alvarado Street, Los Angeles, California, 90057. During a proffer session, IDOWU advised that he and his co-conspirators obtained fraudulent social security cards and driver's licenses near a storefront located at 733 S. Alvarado Street in Los Angeles from a woman later identified as Rosa Esmeralda Rivera Garcia.

61.     On April 9, 2020 at approximately 12:30 p.m., PI Hacker conducted a physical surveillance at The UPS Store #2328 and observed IDOWU driving a black Mercedes-Benz C300 bearing California license plates 8MTU667 pull into the parking lot. IDOWU exited the vehicle while talking on a cellular telephone. IDOWU picked up the USPS Express Mail envelope, exited The UPS Store #2328, and continued to talk on his cellular telephone while standing next to the black Mercedes-Benz C300. A query of the California Department of Motor Vehicles for the license plate revealed the registered owner of the vehicle was Olanike ALO.

### IDOWU Utilizes Alias of Brian Chaffin in Colorado

62.     On May 19, 2020, the manager of another CMRA, The UPS Store #2086, located at 13918 E. Mississippi Avenue, Aurora, Colorado, 80012 advised PI Christine Reins-Jarins that a new customer produced a Nigerian passport to pick up an express envelope as well as two DHL Express envelopes on May 18, 2020. On May 19, 2020, the same customer picked up an Express Mail envelope and produced a Nigerian passport number A10352805 with the name Brian Henry Chaffin, date of birth June 10, 1986 (pictured in paragraph 59). The picture in the passport depicted IDOWU.

63.     On May 22, 2020, PI Reins-Jarins advised that "Chaffin" filed a USPS Official Mail Forwarding Change of Address Order on May 6, 2020 that changed his address to 18121 E. Hampden Avenue, Unit C PMB 561, Aurora, Colorado, 80013. A query on the internet for the address revealed the address resolved to a CMRA named PostNet.

64.     On May 22, 2020, physical surveillance was conducted by FBI Special Agent Jimmy R. Johnson, in conjunction with an FBI surveillance team. They observed IDOWU depart his residence in the aforementioned Mercedes-Benz registered to ALO and drive to a shopping center located at the intersection of E. Mississippi Ave. and S. Havana Street in Aurora, CO. IDOWU parked his vehicle and then walked on foot to a nearby KeyBank branch located at 10502 E. Arizona Place, Aurora, CO. IDOWU was observed standing in parking lot of the Key Bank branch while talking on his phone, and then he walked to the middle drive-thru teller lane to conduct a bank transaction. IDOWU stood in the teller lane for approximately 15 minutes while conducting an apparent bank transaction and then departed on foot back to his vehicle. SA Johnson observed IDOWU apparently counting a large sum of currency when walking away from the bank and then placing it into his pocket.

65.     A Federal Grand Jury Subpoena was served on Key Bank for the transaction(s) that took place on May 22, 2020 at the Key Bank located at 10502 E. Arizona Place, Aurora, Colorado, 80012 in the middle drive-thru teller lane between approximately 12:55 p.m. to

approximately 1:08 p.m. and any account information related to that transaction(s). Key Bank responded to the subpoena and provided the following information:

      a.     A deposit of $1,530 was made at approximately 1:00 p.m. on May 22, 2020 to an account ending in 7429, held by Brian H. Chaffin;

      b.     A withdrawal of $2,000.00 was made at approximately 1:05 p.m. from an account ending in 7429, held by Brian H. Chaffin;

      c.     A Key Express Checking account ending in 7429 was opened on May 14, 2020 by Brain H. Chaffin;

      d.     A Key Active Saver account ending in 1885 was opened on May 14, 2020 by Brian H. Chaffin;

      e.     A copy of a Nigerian passport for Brian Henry Chaffin, number A10352805, bearing a photograph of IDOWU (depicted below) was utilized as an identification document to open the two bank accounts at Key Bank.



66.     Subsequent investigation revealed IDOWU had opened bank accounts at Chase Bank and Bank of America under the Brian Henry Chaffin identity.   Federal Grand Jury Subpoenas were served on Chase Bank and Bank of America for accounts held by Chaffin. Chase Bank and Bank of America responded to the subpoenas with the following information:

a.     A Chase Total Business checking account ending in 3592 was opened on April 24, 2020, held by Brian Henry Chaffin;

b.      A Bank of America Business Fundamental checking account ending in 2285 was opened on May 1, 2020, held by Brian Henry Chaffin, DBA Brian Henry Chaffin;

c.     Two electronic deposits were made into the Chase account ending in 3592 from Mutual of America, which is a financial services company specializing in providing pension and retirement-related products, programs, and services:

i.     $31,902.30 on May 1, 2020; and

ii.     $36,000.00 on May 11, 2020;

d.     Chase Bank check number 97, dated May 1, 2020, drawn on Chase account ending in 3592 for $31,500.00 was made payable to Brian Henry Chaffin and was deposited to the Bank of America account ending in 2285 (the below image depicts IDOWU depositing the check into the Bank of America account ending in 2285);



e.       Chase Bank check number 98, dated May 11, 2020, drawn on Chase account ending in 3592 for $36,000.00 was made payable to Brian Henry Chaffin and was deposited to the Bank of America account ending in 2285 (the below image depicts IDOWU depositing the check into the Bank of America account ending in 2285. Although the individual is wearing a face mask in the image, I know, based on the fact I have met IDOWU in person and have watched numerous surveillance videos of IDOWU in various banks in Orange County, CA and Colorado, the individual in the below image is IDOWU );



67.      Accordingly, given IDOWU's resumption of the use of fraudulent Nigerian identities in Colorado, I submit, based on my training and experience, that probable cause exists to believe that evidence of the Subject Offenses will be found in the Subject Premises, especially given that it is his residence and that such evidence was found at his prior residence in California. I further believe that some of that evidence will exist on electronic storage devices, as was true when agents executed the previous warrant in California upon his residence.

## CONCLUSION

68.     Based on the facts set forth above, I submit probable cause exists to believe evidence of the commission of the Subject Offenses; contraband, the fruits of those crimes, and things otherwise criminally possessed; and property designed or intended for use or which is or has been used as the means of committing those criminal offenses, exist within the Subject Premises, as further described in Attachment A. Therefore, I request permission to search the property identified in Attachment A for the items enumerated within Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Respectfully submitted,

*s/Lynelle C. Torikai*
Lynelle C. Torikai
Special Agent, Federal Bureau of Investigation

Submitted, attested to, and acknowledged by reliable electronic means on this ___22nd___ day of December, 2020.

_____
HON. NINA Y. WANG
UNITED STATES MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

**This affidavit was reviewed and is submitted by Cyrus Y. Chung, Assistant United States Attorney.**